IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| RYAN E. RAIDER, | CASE NO. 1:19-CV-00306 |
| Petitioner, | JUDGE BENITA Y. PEARSON |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| KIMBERLY CLIPPER, WARDEN, | **REPORT AND RECOMMENDATION** |
| Respondent. | |

INTRODUCTION

On February 11, 2019, Petitioner Ryan E. Raider, a prisoner in state custody, filed a

Petition seeking a writ of habeas corpus under 28 U.S.C. § 2254. (ECF #1).

Respondent Kimberly Clipper, in her capacity as Warden of the Lorain Correctional

Institution (hereafter "the State"), filed an Answer/Return of Writ on January 29, 2020. (ECF #8).

Mr. Raider filed a Traverse to Return of Writ on February 28, 2020. (ECF #9). The State filed a

Reply to Petitioner's Traverse on March 5, 2020. (ECF #10).

The District Court has jurisdiction over the Petition under § 2254(a). On May 8, 2020,

pursuant to Local Rule 72.2(b)(2), this matter was referred to a Magistrate Judge for preparation of

a Report and Recommendation. (Non-document entry of May 8, 2020). Pursuant to General

Order 2020-13, this matter was reassigned on July 6, 2020 to the Magistrate Judge who succeeded

the originally-assigned Magistrate Judge. (Non-document entry of July 6, 2020). The matter was

ultimately reassigned to me on May 25, 2021, pursuant to General Order 2021-06. (Non-

document entry of May 25, 2021). For the reasons discussed below, I recommend the Petition be **DISMISSED**. I further recommend that Mr. Raider not be granted a certificate of appealability.

## FACTUAL BACKGROUND

For purposes of habeas corpus review of state court decisions, a state court's findings of fact are presumed correct and can be contravened only if the habeas petitioner shows, by clear and convincing evidence, that the state court's factual findings are erroneous. 28 U.S.C. § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir.), *cert. denied*, 571 U.S. 1077 (2013); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001), *cert. denied*, 535 U.S. 966 (2002). This presumption of correctness applies to factual findings made by a state court of appeals based on the state trial court record. *Mitzel*, 267 F.3d at 530.

In its opinion affirming Mr. Raider's convictions, the Ohio Ninth District Court of Appeals summarized the underlying facts as follows:

> {¶ 2} In the early morning hours of October 12, 2013, Brandon Smith was shot in the head while lying in his bed next to his girlfriend, E.M. Smith died from his injuries. Smith's housemate, Raider, admitted to shooting Smith, but asserted that it was an accident; Raider maintained that the gun went off when he dropped the weapon.

> {¶ 3} Following an investigation, Raider was indicted on one count of aggravated murder, two counts of murder, and two counts of felonious assault. Each count contained an accompanying firearm specification. The matter proceeded to a jury trial, at which the following testimony was adduced.

> {¶ 4} The State's theory of the case was that Raider intentionally shot and killed Smith so that Raider could develop a relationship with E.M. The State argued that the evidence supported that it was Raider's purpose to shoot Smith and that the shot was fired at close range. The defense argued that there was no ill will between Smith and Raider and that the evidence supported that the shot was accidentally fired when Raider dropped the gun while standing in the doorway, a dozen or so feet away.

> {¶ 5} E.M. lived a couple houses down from Smith's and Raider's house. She spent a fair amount of time with Raider, given that Raider lived with Smith, and thought

2

Smith and Raider seemed to get along and that their relationship seemed pretty normal. E.M. considered Raider to be a friend. He fixed her car once and took her to a doctor's appointment. However, E.M. described Raider as either being in a great mood, or being cranky and tired. One time, about a week before Smith's death, when Raider seemed cranky and tired, E.M. told Raider that she thought he was going to go crazy and kill someone. Raider just laughed.

{¶ 6} E.M. testified that, while Smith did not have any firearms, Raider did, and he would take them out constantly. She indicated that he also had a BB gun that he had shot people with, including her.

{¶ 7} The day before the shooting, in between E.M.'s jobs, E.M. and Smith went to a movie to celebrate Smith's recent birthday. After work, they went to Smith's house and were watching TV with Raider and another friend. The four then went to a nearby bar in Avon. While at the bar, Raider talked with E.M.'s son's father. Raider asked on multiple occasions that night whether E.M.'s son's father had ever thought of getting back together with E.M. and Raider seemed relieved when E.M.'s son's father said no. While at the bar, E.M. had five shots and ended up getting into an argument with her son's father's ex-girlfriend, whom she chased out of the bar with her shoe. Smith was upset by the argument and he and E.M. talked about it outside the bar. The two decided to leave, but Raider would not let them walk home, and insisted on driving them.

{¶ 8} After dropping them off at Smith's house, Raider went back to the bar. While Raider had been drinking that evening, E.M.'s son's father indicated that Raider seemed fine and did not seem impaired. E.M.'s son's father was not worried about Raider driving and indicated that he did care about people driving drunk as he had been involved in an accident when he was younger caused by a drunk driver.

{¶ 9} When Raider returned home, Smith and E.M. were in the kitchen talking. E.M. thought Raider appeared to have been drinking. He brought out a handgun and pointed it at Smith's head and asked E.M. if Raider was a was a robber, would E.M. let him kill Smith. Smith and E.M. thought Raider was joking around, so they played along and E.M. said no and took the gun and pointed it at her own head. At that point, Raider ripped the gun away from her, unloaded it, and the bullets fell to the floor. E.M. had not realized the gun was loaded, yelled at Raider, and went outside.

{¶ 10} While outside, E.M. called her son's father to apologize for her behavior. E.M. came back inside, and saw Smith and Raider sitting on Smith's bed talking. E.M. went in the bathroom and began crying because she was disappointed in herself and her behavior. Raider came in the bathroom and asked if she was alright. She responded that she felt like a bad mother. Raider told her that she was a great mom and that he loved her. He had never told her anything like that before. She thought he was just drunk.

3

{¶ 11} Raider picked E.M. up, carried her into Smith's bedroom, and laid her on the bed next to Smith. Smith was lying in the bed, under the blankets, and towards the edge of the bed nearest the door. E.M. was placed even closer to the door, almost at the edge of the bed, in a "spoon[ing]" position next to Smith. Raider placed Smith's right arm over E.M. Smith whispered in E.M.'s ear and told her to pretend to be asleep because Raider was being annoying. They both closed their eyes. E.M. heard Raider mumble something and walk out. The next thing E.M. heard was Raider say, "If you lay there just like that." E.M. then heard a really loud sound that caused her to grab her right ear in pain and jumped up. She looked over at Smith and saw blood coming out of his temple. E.M. saw Raider walking out of the room and yelled that he had shot Smith. Raider turned around and told her to call 911. E.M. had been putting pressure on the wound and Raider pushed her away and told her to call 911 and wait outside for the ambulance.

{¶ 12} Sergeant Kevin Collins with the Avon Police Department was the first to arrive on the scene. He met E.M. in the front yard. She was screaming that someone had been shot and that someone was inside administering first aid. She told Sergeant Collins that she thought the shooting was an accident. Over objection, Sergeant Collins opined that it was not legal to handle a firearm while intoxicated. Sergeant Collins went in the residence and observed Raider administering first aid to Smith when he entered Smith's bedroom. Sergeant Collins had an audio recording device on when he went in the house. Raider can be heard on multiple occasions saying that he dropped the gun and it went off. Raider indicated that he was standing in the doorway near the doorjamb when he dropped the gun. Raider told police that the gun was in the other bedroom, probably under the bed.

{¶ 13} Captain Timothy Barrett, a firefighter and paramedic with the Avon Fire Department testified that by the time he arrived on the scene, Smith had snoring or agonal respirations which was a very serious condition and was indicative of a head injury. When Captain Barrett was lifting Smith onto the backboard to transport him to the hospital, Captain Barrett discovered a shell casing underneath Smith's head and pointed it out to the police.

{¶ 14} Sergeant Robert Olds of the Avon Police Department assisted with evidence collection at the scene of the shooting. Two rounds of ammunition were found on the kitchen floor. A gun was located under Raider's bed with blood staining on it. The slide of the weapon was in the backwards position when it was found. On Raider's bed was a magazine for a rifle and an empty holster. Blood smears were also found on the bed. After the bed was moved, in the corner of the room, a magazine that fit the gun found under the bed was located. Blood smears were found on the wall near where magazine was found in the corner. There were six rounds left in the magazine. Raider's room also contained gun safes and several weapons. The only handgun located was the one found under the bed. Additionally, a pellet gun, assault rifles, and shotguns were found in the room. Sergeant Olds estimated that from the

4

doorway of Smith's room to where the large blood spot was found on Smith's bed was 12 to 15 feet.

{¶ 15} After E.M. had time to think about the events and after telling the events to various people, she began to think that the shooting was not an accident. On October 14, 2013, E.M. went to the police station to tell the police some details about the evening that she had unintentionally left out and to tell them that her opinion about the events had changed; she no longer believed the shooting was an accident.

{¶ 16} Around October 14, 2013, Sergeant Bryan Rado with the Avon Police Department started looking at the items of evidence that had been collected. He indicated it was important to examine the evidence and to attempt to analyze whether the events could have taken place the way that Raider said that they did. He reiterated that, initially, the shooting was investigated as possibly being accidental. Sergeant Rado indicated that the "slug" had not been located and so he searched through the physical evidence and discovered it embedded in one of the pillows that had been on Smith's bed. Subsequently, Sergeant Rado went to the crime scene. In Raider's bedroom, he noticed that some paint had been nicked away from the wall in the corner of the room near the bed, near where prior investigators had located the magazine. Investigators speculated that the magazine had been thrown against the wall. After looking at the photographs and other evidence and talking with other officers, Sergeant Rado became troubled by Raider's version of events. Sergeant Rado testified that based on where the casing was located (on the bed), and because it appeared the slug entered the side of the pillow as opposed to the front, there were concerns with Raider's statement that the gun went off while he was standing in the doorway, as opposed to closer to the bed.

{¶ 17} Several items from the crime scene were tested for DNA evidence, including the .40 caliber handgun and magazine. A sample from a presumptive blood stain from the t-shirt Raider was wearing contained a DNA profile consistent with that of Smith. The trigger of the handgun also contained a profile consistent with Smith's profile. The swab from the slide of the handgun and the swab from the handle and trigger guard contained a mixture consistent with contributions by both Smith and Raider. The profile obtained from the presumptive bloodstain on the handgun was consistent with Smith's profile. The profile from the stain on the magazine was consistent with Smith's and the profile from the swab of the remainder of the magazine was a mixture consistent with both Smith's and Raider's profiles. No DNA profile was obtained from a swab of the rounds found inside the magazine. Gunshot residue testing indicated that particles highly indicative of gunshot primer residue were identified on samples from E.M., Raider, and Smith. The results signified that those individuals discharged a firearm, were near a firearm when it was discharged, or handled an item with gunshot primer residue on it.

{¶ 18} Joshua Barr, a forensic scientist assigned to the firearms section of the Ohio Bureau of Criminal Investigation ("BCI") examined the handgun from the case. He

found it to be an operable Sig Sauer model P226 .40 caliber semiautomatic pistol. Barr determined that the bullet fragments removed from Smith's head were fired from the gun he examined. He indicated that "[d]uring the firing cycle sometimes [the ejection of the casing] can be unpredictable, but it's designed to go to the right and slightly rearward." However, he acknowledged that it is possible the casing could be ejected forward slightly. When asked if the casing could be ejected 20 feet forward, Barr stated that "would be unlikely, but it's possible."

{¶ 19} Barr testified that the gun had a single-action and a double-action mode. In single-action mode, it takes approximately 4 pounds of force to fire the gun, while in double-action mode it takes approximately 8 pounds of force to fire the gun. To switch the gun to double-action mode, the decocker lever is pressed. Additionally, Barr averred that an additional safety feature of the gun prevents the hammer from hitting the firing pin without the trigger being pressed. Thus, "if [the] gun were to drop or you would hit the back of it, it couldn't actually contact the firing pin to fire the cartridge." Barr also indicated that the gun has a firing pin block which prevents the firing pin "from going through" absent the trigger being pulled. Barr averred that the gun is a safe gun. He testified that absent the gun malfunctioning or something being broken, the gun would not fire without the trigger being pulled and that he found nothing broken or malfunctioning in the weapon.

{¶ 20} Dan Galita, M.D., a board certified anatomic and forensic pathologist from the Cuyahoga County Medical Examiner's office, who performed the autopsy on Smith, testified that Smith died from a gunshot wound to the head with skull and brain injuries. The entrance wound was in the left temple and was slightly oval shaped. Medical personal sutured the wound in an attempt to stop the bleeding. Dr. Galita removed the sutures during the autopsy and was aware that upon removal, 8 puncture wounds, 4 on each side of the wound, remained in the skin. Dr. Galita indicated that wound was surrounded by very dense, or confluent, stippling, as well as isolated stippling marks at the periphery. He testified that the area around the wound was also burned and that there were black gunpowder particles embedded within the wound itself, one inside the wound track, and one in the margin. From those findings, Dr. Galita averred that the shooting was close range, meaning that the gun was less than 6 inches away from the skin when it was discharged. He believed that, more than likely it was probably 1 or 2 inches from Smith's skin when it was fired. He further indicated that one would not expect to see stippling around a wound from a shot fired at distance greater than 3 feet. Dr. Galita testified that he was aware of the phenomenon of pseudostippling, which looks like stippling but is caused by something other than gunpowder, such as the puncture wounds created by sutures. According to Dr. Galita, pseudostippling is "large, * * * irregular in shape, and * * * easy to identify." Dr. Galita stated that he had not confused the puncture wounds for stippling and was aware of where the puncture wounds were because he himself removed the sutures. Dr. Galita pointed out for the jury the areas he believed demonstrated the stippling as compared to the puncture wounds left from the sutures.

{¶ 21} Dr. Galita also described the exit wound as star shaped and showed it to the jury in the photographs. From the location of the entrance and exit wounds, Dr. Galita asserted that the "trajectory of the bullet was from front to back, left to right, and upwards." The gunshot wound caused extensive damage to the brain and skull and was not a survivable injury. Dr. Galita posited that the shooting caused an instant loss of consciousness.

{¶ 22} The defense presented three witnesses in an effort to support its theory that the shooting was accidental: on [*sic*] Renuart, Humphrey Germaniuk, M.D., and Jason Thomason.

{¶ 23} Renuart was a friend of Raider's. During the day of October 11, 2013, Renuart went to the gun range with Raider for approximately 2 to 2.5 hours to target practice with rifles and handguns. Renuart testified that the two traded guns back and forth, and, at one point, Renuart used Raider's Sig Sauer pistol. He averred that the gun had "a very light trigger pull." To Renuart, that meant that when "you start to pull it, fires." He added that if "you're not used to that, which [he] was not, it almost feels like it goes off unintentionally." He claimed that there were three times during the first clip where he shot the weapon "without even realizing that [he] was going to pull the trigger." Renuart said that he laughed about it and stated that, "This gun scares me." When the gun ejected the casings, he indicated that they ejected to the right side of the gun. He testified that the gun at trial looked like the gun he had used. On cross-examination, Renuart admitted that he had never fired a Sig Sauer before that day and so did not know whether he shot it in single-action or double-action mode, or what the safety features of the weapon were.

{¶ 24} Dr. Germaniuk, the medical examiner and coroner for Trumbull County, who is also board certified in forensic and anatomic pathology, disagreed with some of Dr. Galita's findings. Specifically, Dr. Germaniuk did not see any stippling around the gunshot wound, soot particles, or burning of the skin based upon his review of the evidence, including the photographs. However, he acknowledged that the person performing the autopsy would be in the best position to view the physical evidence. Dr. Germaniuk thought it was possible Dr. Galita mistook the pseudostippling, caused by the puncture wounds from the sutures, as stippling. Dr. Germaniuk opined that there was no evidence of a contact or close range gunshot wound. He concluded that it was a distant gunshot wound.

{¶ 25} Thomason, who is an attorney and CEO and general counsel for the Appalachia Group, and also the chief instructor for the firearms safety academy for Ohio Valley Outdoors, performed testing with a Sig Sauer firearm. However, Thomason did not test the specific weapon used in the shooting. The gun he examined had a single action trigger pull of 4.3 pounds and a double action trigger pull of 9.8 pounds. Thomason fired the weapon from different distances through two sheets of paper taped together to examine the penetration and the pattern that

was left on the paper. He performed tests from 2 inches away from the paper to 28 inches away. He concluded that up to 6 inches away there was significant burning of the front area of the page and that the punctures created by the unburned propellant were significant up to a distance of 8 inches. Thomason also asserted that there were still punctures in the paper all the way up to a distance around 24 to 28 inches. However, he could not make a comparison to human skin. He noted that the ejection of the casings was erratic but "[e]ssentially, the shells eject to the right[.]" He also testified that the firearm could fire if it was dropped from any distance; however he did not test that with the weapon and instead got that information from the manual. He opined that the model was "somewhat of an antiquated design" but that it was still "a popular firearm today." He believed that the "Ohio State Highway Patrol carries them[,]" however, "most departments have [gone] to a striker-firing system that doesn't have a hammer, because they are safer than systems that contain a hammer. Because when you have a hammer, you always have the potential of that hammer being struck with some inertia that could cause the system to fire."

{¶ 26} On cross-examination, Thomason admitted that he does business with Raider's father because Raider's father is a gun wholesaler. Without objection, he was asked whether he was aware that the State of California drops these types of guns out of planes without them discharging. Additionally, Thomason was asked about, and ultimately disagreed with, a statement from a website that indicated that the type of gun at issue "drop[s] safe from a reasonable distance," and that there would have to be "enough force to bend some serious metal before the gun could possibly go off." Following that, Thomason was asked what if he was told that the State dropped [*sic*] a Sig Sauer "some 14 times" and it did not discharge. An objection to that question was sustained but there was no request to strike it or specifically instruct the jury about it.

{¶ 27} When asked to make the trigger move forward to hit the firing pin without pulling the trigger while in double action mode, Thomason testified that he could not do so. He indicated that there had to be enough force to overcome the safety notch; he did not know how much force would be needed and that it would depend on the individual firearm because each is not exactly identical. When asked if he was suggesting that the murder weapon, if dropped, was going to go off because the hammer would hit the firing pin, he averred that he "never made that statement[,]" but "[a]ny firearm can go off if dropped." Thomason specifically stated that he "wasn't opining about that particular gun [ (the murder weapon) ]." Instead, he "was talking about that design in general." He agreed that his testimony should not be interpreted to mean that the murder weapon was in any way defective on the day of the shooting. Thomason also acknowledged, without objection, that a person is not supposed to handle a weapon while he has been drinking, as the person would be "under disability."

8

{¶ 28} During trial, Raider's counsel requested that the trial court instruct the jury that "the Defendant had no obligation to prove anything concerning accident[.]" The trial court declined to give that particular instruction.

{¶ 29} Following deliberations, the jury found Raider not guilty of aggravated murder, but guilty of the remaining counts and accompanying specifications.

*State v. Raider*, 97 N.E.3d 1191, 1194-1200 (Ohio Ct. App. 2017), *appeal not allowed*, 93 N.E.3d

(1004) (Ohio 2018).

## PROCEDURAL HISTORY

### State Court Conviction

On November 21, 2013, Mr. Raider was charged in a five-count indictment returned by a Lorain County grand jury. (ECF #8-1 at PageID 101-03). The charges were as follows:

- Count 1: aggravated murder in violation of Ohio Rev. Code § 2903.01(A), with a firearm specification;

- Count 2: murder in violation of Ohio Rev. Code § 2903.02(A), with a firearm specification;

- Count 3: murder in violation of Ohio Rev. Code § 2903.02(B), with a firearm specification;

- Count 4: felonious assault in violation of Ohio Rev. Code § 2903.11(A)(1), with a firearm specification; and

- Count 5: felonious assault in violation of Ohio Rev. Code § 2903.11(A)(2), with a firearm specification.

(*Id.*).

Trial began on January 11, 2016, in the Lorain County Court of Common Pleas. (ECF #8-2 at PageID 396). On January 20, 2016, the jury returned a verdict of not guilty on Count 1, but guilty on Counts 2, 3, 4, and 5 including the firearm specification in each of those counts. (ECF #8-6 at Page ID 1159-63).

9

Sentencing took place on February 4, 2016. (ECF #8-6 at PageID 1167). After hearing from the State and counsel Mr. Raider, the trial court announced its sentence. (*Id.* at PageID 1201-03) As set forth in the Judgment Entry of Conviction and Sentencing:

> Upon consideration of all matters set forth by law it is the judgment of law and sentence of the court that defendant be sentenced to:
>
> **Count 2: Murder, 15 years to life (mandatory); 3 year firearm specification (mandatory);**
>
> **Count 3: Allied offense, merged for sentencing;**
>
> **Count 4: Allied offense, merged for sentencing;**
>
> **Count 5: Allied offense, merged for sentencing.**
>
> **Mandatory sentence for Count 2, Murder consecutive to 3 year mandatory firearm specification.**
>
> **Aggregate mandatory sentence of life in prison, not eligible for parole until 18 years served.**
>
> **Credit for time served on this case is awarded**.

(ECF #8-1 at PageID 218-19). Mr. Rider was also ordered to pay costs of prosecution and funeral expenses of Mr. Smith to his father. (*Id.* at 221.)

**Direct Appeal**

On March 3, 2016, Mr. Raider filed a Notice of Appeal to the Ohio Ninth District Court of Appeals. (*Id.* at PageID 222). Through new counsel, he filed his Merit Brief of the Appellant on July 25, 2016, asserting five assignments of error, as follows:

> <u>First Assignment of Error:</u> Defense counsel's failure to object to unfairly prejudicial evidence and failure to request a lesser include [*sic*] offense deprived the appellant his right to effective assistance of trial counsel.
>
> <u>Second Assignment of Error:</u> The prosecutor's improper attempt to submit to the jury a matter outside the evidence through questions asked of a defense witness during cross-examination deprived the appellant a fair trial.

Third Assignment of Error: The trial court's erroneous jury instruction deprived the appellant his right to a fair trial under the state and federal Due Process Clauses.

(ECF #8-1 at PageID 228). The State filed its Brief of Appellee on September 6, 2016. (*Id.* at PageID 259). Mr. Raider filed a Reply Brief on September 27, 2016. (*See* ECF #8-1 at PageID 301).

On September 25, 2017, the Ninth District issued its Decision and Journal Entry, affirming the trial court's judgment in all respects. (*Id.* at PageID 314-337; *see also State v. Raider*, 97 N.E.3d at 1205). One judge dissented, indicating he would have upheld Mr. Raider's Second Assignment of Error. *State v. Raider*, 97 N.E.3d at 1206 (Callahan, J., dissenting).

On November 3, 2017, Mr. Raider filed a Notice of Appeal in the Ohio Supreme Court, seeking a discretionary jurisdictional appeal on the basis that his felony conviction "raises a substantial constitutional question and is one of public or great general interest." (*Id.* at PageID 339; *see also* Ohio Sup. Ct. R. Prac. 5.02(A)(3)). His Memorandum in Support of Jurisdiction asserted three Propositions of Law, as follows:

Proposition of Law I: The failure of defense counsel to request a lesser included offense where merited by the facts introduced at trial, combined with the failure to object to unfairly prejudicial evidence which included "gut feeling" testimony from a witness that she believed he would go crazy and kill in the future, deprives a defendant his right to the effective assistance of trial counsel.

Proposition of Law II: The prosecutor may not impeach a defense expert through questioning, by alluding to testing allegedly conducted in his presence if no evidence of that testing was introduced at trial

Proposition of Law III: The trial court may not refuse to instruct the jury as requested by the defense where the request is an accurate statement of the law, clarifies an existing instruction which is not sufficiently covered elsewhere in the jury instructions as a whole.

(*Id.* at PageID 341). The State filed a Memorandum in Opposition to Jurisdiction on December 4, 2017. (*Id.* at PageID 359). On March 14, 2018, the Ohio Supreme Court declined to accept Mr. Raider's appeal. (*Id.* at PageID 377; *State v. Raider*, 93 N.E.3d 1004 (Ohio 2018) (table)).

On February 11, 2019, Mr. Raider filed his Petition in this matter. (ECF # 1).

## FEDERAL HABEAS CORPUS

Mr. Raider's Petition, filed through the same counsel who represented him in the appeals to the Ninth District and the Ohio Supreme Court, sets forth three grounds for relief, as follows:

> **First Ground**: The failure of defense counsel to request a lesser included offense, combined with the failure to object to unfairly prejudicial evidence which included "gut feeling" testimony from a witness that she believed he would go crazy and kill in the future, deprives a defendant his right to the effective assistance of counsel.
>
> **Second Ground**: Misconduct by the prosecutor deprived the petitioner his due process right to a fair trial.
>
> **Third Ground**: The trial court's refusal to provide accurate jury instructions deprived the petitioner his due process right to a fair trial.

(ECF #1 at PageID 5, 7, 8; ECF #1-1, PageID 26, 36, 39).

Mr. Raider requests this Court grant the petition and order a new trial. (ECF #1 at PageID 15).

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Mr. Raider's petition for writ of habeas corpus. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA recognizes that "[s]tate courts are adequate forums for the vindication of federal rights" and therefore acts as a "formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). It "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the

benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal citation and quotation omitted).

An application for habeas corpus cannot be granted for a person in custody pursuant to a state conviction unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d). Thus, a court may grant habeas relief if the state court arrives at a conclusion that is contrary to a decision of the Supreme Court on a question of law, or if the state court decides a case differently than did the Supreme Court on a materially indistinguishable set of facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Habeas courts review the last explained state-court judgment on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991). The appropriate measure of whether a state court decision unreasonably applied clearly established federal law is whether that state adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Williams*, 529 U.S. at 409-11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000), *cert. denied*, 531 U.S. 1089 (2001). For purposes of § 2254(d)(1), clearly established federal law "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "the holdings, as opposed to dicta, of [Supreme Court] decisions." *Williams*, 529 U.S. at 412. A state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam). A state-court decision is an unreasonable

determination of the facts only if the court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003). A petitioner bears the burden to rebut the state court's factual findings "by clear and convincing evidence." 18 U.S.C. § 2254(e)(1). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

The standard is intended to be difficult to meet and reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal just systems," not a substitute for ordinary error correction through appeal. *Id.* at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979) (Stevens, J., concurring in judgment)). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* at 103.

### LAW AND ANALYSIS

**First Ground for Relief**

In his first ground for relief, Mr. Raider asserts his trial counsel was ineffective, pointing to four acts or omissions. First, trial counsel did not request a jury instruction on the lesser included offense of reckless homicide. (ECF #1-1 at PageID 28). Second, trial counsel did not object to testimony during trial that Mr. Raider engaged in uncharged criminal conduct by handling a firearm while intoxicated. (*Id.* at PageID 31). Third, trial counsel did not object to the prosecutor electing testimony from E.M. that Mr. Raider had previously shot her with a BB gun. (*Id.* at PageID 33). Fourth, trial counsel did not object to testimony from E.M. that about a week before the shooting she had told Mr. Raider "she thought he was going to go crazy and kill someone in

the future." (*Id.* at PageID 34). Mr. Raider asserts that the cumulative effect of these individual errors deprived him of his right to effective assistance of counsel. (ECF #9 at PageID 1589).

To prevail on this claim, Mr. Raider must demonstrate his trial counsel's performance was so deficient that it resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This deferential standard requires a reasonable probability that but for counsel's errors, the results of the proceedings would have been different. *Id.* at 694. And at the habeas stage, the question is not whether counsel's actions were reasonable, but whether there is any reasonable argument that counsel's conduct satisfied the deferential standard in *Strickland*. *Premo v. Moore*, 562 U.S. 115, 123 (2011).

As a result, the standard on habeas review "severely constrains" this Court's analysis. *See Smith v. Anderson*, 632 F.3d 277, 281 (6th Cir. 2011). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." *Harrington*, 562 U.S. at 105. And "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* Because § 2254(d)(1) limits the circumstances in which federal courts may grant a writ of habeas corpus, the Supreme Court has described habeas review of state court adjudications of ineffective assistance of counsel claims as "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). "In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable, the state court's decision must have been

more than incorrect or erroneous ... The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520 (citations omitted).

I now address each of the alleged errors in turn. I then discuss Mr. Raider's argument regarding their alleged cumulative effect.

*First Alleged Error – Reckless Homicide Jury Instruction*

Mr. Raider maintains his trial counsel should have asked for the jury to be instructed on the lesser included offense of reckless homicide. (ECF #1-1 at PageID 28). The State responds that Mr. Raider's trial strategy "hung on making the jury balk at the idea that Raider did anything 'purposely,'" which is a required element of proof for the murder charge under Ohio Rev. Code § 2903.02(A). (ECF #8 at PageID 72-73).

Reckless homicide is addressed in Ohio Rev. Code § 2903.041, which provides that "[n]o person shall recklessly cause the death of another or the unlawful termination of another's pregnancy." Pursuant to Ohio Rev. Code § 2901.22(C), a person acts recklessly when, "[w]ith needless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature."

In reviewing this alleged error during Mr. Raider's direct appeal, the Ninth District wrote as follows:

> {¶ 33} With respect to trial counsel's failure to request a lesser-included offense instruction, this Court has stated that "whether to request a specific jury instruction on a lesser-included offense is a matter of trial strategy left to trial counsel's discretion." *State v. DuBois*, 9th Dist. Summit No. 21284, 2003-Ohio-2633, 2003 WL 21185941, ¶ 5. As the issue to request a jury instruction on the lesser-included offense falls squarely within defense counsel's purview of trial tactics, we will not second-guess counsel's decision. Furthermore, we see nothing in the record to demonstrate that counsel's decision not to request a jury instruction on the lesser-included offense was anything other than a tactical election to seek an acquittal rather than a conviction on the lesser-included offense.

16

*Raider*, 97 N.E.3d at 1200.

The Sixth Circuit has held that "[o]nly if the failure to instruct on lesser included offenses results in a miscarriage of justice or a fundamental defect in due process, will this type of error merit habeas relief." *Samu v. Elo*, 14 F. App'x 477, 479 (6th Cir. 2001). Furthermore, "no clearly established Supreme Court authority requires lesser-included offense instructions in non-capital cases. Thus, under the AEDPA, 28 U.S.C. § 2254(d)(1), this claim is not a basis for habeas relief." *Id.*

Thus, even if Mr. Raider's counsel had requested the trial court instruct the jury on the lesser included offense of reckless homicide, the trial court would not have been obligated to do so. Furthermore, under the facts and circumstances of this case, I cannot find that counsel's apparently strategic decision not to request the reckless homicide instruction resulted in a miscarriage of justice or a fundamental defect in due process. Numerous cases from the Sixth Circuit and this Court involving similar claims are consistent with this conclusion. *See, e.g., Tegeler v. Renico*, 253 F. App'x 521, 524 (6th Cir. 2007) (holding that, in a murder case, due process does not require a jury instruction on the lesser included offense of voluntary manslaughter); *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002) (involuntary manslaughter instruction not required by due process), *cert. denied*, 537 U.S. 1192 (2003); *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001) (voluntary manslaughter instruction not required), *cert. denied*, 535 U.S. 975 (2002); *Williams v. Clipper*, No. 1:17CV2469, 2019 WL 12071801, at *7 (N.D. Ohio Dec. 20, 2019) (finding that, in a murder case, petitioner's due process rights not violated from failure to instruct jury on reckless homicide), *report and recommendation adopted*, 2021 WL 855117 (Mar. 8, 2021); *Hubbard v. Sheldon*,

No. 3:15CV767, 2016 WL 7404671, at *22 (N.D. Ohio Dec. 21, 2016) (same), *cert. denied*, 139 S.

Ct. 188 (2018).

Accordingly, I find that the first alleged error, standing alone, does not constitute

ineffective assistance of counsel.

*Second Alleged Error – Alleged Uncharged Criminal Conduct*

The second error by trial counsel that Mr. Raider contends gives rise to ineffective

assistance was the lack of proper objection to testimony intimating that Mr. Raider had engaged in

uncharged criminal conduct by handling a firearm while intoxicated on the evening of the

shooting. (*See* ECF #1-1 at PageID 31). Mr. Raider points to the following testimony on redirect

examination from Sergeant Collins, the first officer to arrive at the scene:

Q.      Let's start with the word "accident." You're a firearms instructor?

A.      Yes.

Q.      Can you tell The Court and Jury whether it's legal in the state of Ohio to
        handle a firearm while you're intoxicated?

        MR. HAFFEY: Objection.

        THE COURT: Basis.

        MR. HAFFEY: Improper redirect.

        MR. CILLO: He opened the door to the word "accident."

        THE COURT: Overruled.

A.      No. It is not legal.

Q.      Is that 2923.15 of the Ohio Revised Code?

A.      I would have to look up to double check, but that's probably right.

(ECF #8-3 at PageID 646). Mr. Raider argues that, while his trial counsel objected to this testimony (and was overruled), the basis of the objection was misplaced. According to Mr. Raider, the proper objection should have been that the testimony was unduly prejudicial. (ECF #1-1 at PageID 32). Mr. Raider further maintains that "[t]he prosecutor further exacerbated the prejudice in his closing argument, again without objection from the defense." (*Id.*) (citing ECF #8-6 at PageID 1443).

The State offers two responses. First, it maintains in effect that the question was of no import, because "[n]o reasonable juror would have thought that without the statute the behavior would be somehow normal." (ECF #8 at PageID 76). Second, it maintains that "the alleged uncharged misconduct as to drinking while handling a firearm is related factually to evidence in the case. It is all part of the res gestae inextricably intertwined with the charged offense." (*Id.* at PageID 76-77).

In reviewing this alleged error, the Ninth District wrote as follows:

{¶ 34} Raider challenges counsel's failure to properly object to Sergeant Collins' testimony that it was illegal to handle a firearm while intoxicated. While counsel did object, he did so on the basis that the testimony was improper redirect, not that the testimony was evidence of an uncharged crime. Even assuming that such testimony was improper evidence of an uncharged crime, we cannot say that the failure to object was prejudicial. Thomason, an attorney, also acknowledged during cross-examination, without objection, that a person is not supposed to handle a weapon while he has been drinking, as the person would be "under disability." Raider has not challenged on appeal trial counsel's failure to object to that testimony. Accordingly, we cannot conclude there was ineffective assistance with respect to the admission of Sergeant Collins' testimony as there could be no prejudice in light of the other admitted and unchallenged testimony.

*Raider*, 97 N.E.3d at 1200-01.

Had trial counsel objected to the testimony of Sergeant Collins regarding the impropriety of handling a weapon while intoxicated on the basis that it was unduly prejudicial (*i.e.*, prohibited

by Ohio Evidence Rule 403), he would have necessarily conceded the relevance of that testimony.

After all, Rule 403 only requires the exclusion of relevant testimony that is substantially

outweighed by its potential for undue prejudice. *See* Ohio Evid. R. 403(A) ("*Although relevant,*

*evidence is not admissible if its probative value is substantially outweighed by the danger of unfair*

*prejudice, of confusion of the issues, or of misleading the jury.*") (emphasis added); *see also United*

*States v. Nadeau*, 598 F.3d 966, 969 (8th Cir. 2010) ("Unfair prejudice speaks to the capacity of

some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different

from proof specific to the offense charged.") (cleaned up). Trial counsel may not have wished to

make such a concession, and thus may have chosen an alternative basis on which to object to

Sergeant Collins' testimony. It is not the province of this court to second-guess tactical decisions of

trial counsel. Moreover, "[j]ust because an objection has merit, 'it does not follow that counsel was

incompetent for failing to [make it].'" *Zeledjieski v. Superintendent Greene SCI*, 833 F. App'x 950, 956

(3d Cir. 2020) (quoting *Yarborough v. Gentry*, 540 U.S. 1, 7 (2003) (per curiam)). Indeed,

"[s]ometimes, a valid objection might even backfire . . . ." *Id.*

Finally, the impact of any prejudice arising from Sergeant Collins' testimony regarding the

impropriety of handling firearms while intoxicated is mitigated by similar testimony from the

defense's expert witness, Thomason. As the Ninth District noted, Thomason testified on cross-

examination that "a person is not supposed to handle a weapon while he has been drinking, as the

person would be 'under disability.'" *Raider*, 97 N.E.3d at 1200.[1] No objection was made to this

---

[1]      The State's cross-examination of Mr. Thomason concluded with the following two
questions:

Q.      Do you know the legal limit in the State of Ohio?
A.      .08, I believe.

testimony, and Mr. Raider does not claim here that his trial counsel's failure to do so was ineffective.

For all of these reasons, I find that the second alleged error, standing alone, does not constitute ineffective assistance of counsel.

*Third Alleged Error – Prior Bad Act in Shooting E.M. with BB Gun*

The third error by trial counsel that Mr. Raider contends gives rise to ineffective assistance was the lack of proper objection to E.M.'s testimony that Mr. Raider had previously shot her with his BB gun. (*See* ECF #1-1 at PageID 33). The testimony in question was as follows:

Q.      You said he'd always have them out. What would he be doing with them?

A.      Well, he actually – he did have a smaller one, but it was a BB gun, I believe. And he would bring that out. And he'd actually shot people with the BB gun.

Q.      Did he ever –

A.      He shot me with it.

Q.      He shot you with the BB gun?

A.      Correct.

Q.      When did that happen, if you recall?

A.      I don't. I'm not sure when exactly.

Q.      How did that feel?

A.      It stung.

Q.      Did you ever or did you – did you ever talk to him about that or kind of express how you felt about the fact that he had shot you with a BB gun?

---

Q.      Right. And are you supposed to handle a weapon while you've been drinking?
A.      No, sir. You're under disability.

(ECF #8-6 at PageID 1019).

A.      I don't believe so.

(ECF #8-3 at PageID 777). Mr. Raider claims this testimony should have been excluded pursuant

to Ohio Evidence Rule 404(B). (ECF #1-1 at PageID 33). The State responds that the testimony

was properly admitted to show absence of mistake or accident by Mr. Raider. (ECF #8 at PageID

79).

In assessing this matter during Mr. Raider's direct appeal, the Ninth District concluded as

follows:

> Raider next argues that trial counsel was ineffective for failing to object to E.M.'s
> testimony that Raider had previously shot her with a BB gun. Raider argues that
> identity was not an issue and thus the only reason to admit that evidence would be
> to portray Raider as a bad person or to show that he had a propensity for shooting
> his friends. The State points out that, "[e]vidence of other crimes, wrongs, or acts * *
> * may * * * be admissible for other purposes, such as proof of motive, opportunity,
> intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
> Evid.R. 404(B). The State contends that the evidence was admissible to demonstrate
> the absence of mistake or accident, particularly since Raider argued that the shooting
> was accidental. Raider has failed to address this point in his argument on appeal.
> Further, this Court has concluded that, "a failure to object may be considered sound
> trial strategy in that '[a] competent trial attorney might well eschew objecting * * * in
> order to minimize jury attention to the damaging material.'" *State v. Charlton*, 9th
> Dist. Lorain No. 12CA010206, 2014-Ohio-1330, 2014 WL 1345268, ¶ 54, quoting
> *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 90. Given
> Raider's defense at trial and his limited argument on appeal, we cannot say that
> Raider has met his burden to demonstrate ineffective assistance of trial counsel in
> this instance.

*Raider*, 97 N.E.3d at 1201.

Like Ohio law, federal habeas law recognizes that "[a] petitioner's ineffective assistance

claim based on counsel's failure to object will not succeed if the decision not to object flowed from

objectively reasonable trial strategy." *Walker v. Morrow*, 458 F. App'x 475, 487 (6th Cir. 2012)

(citing *Hodge v. Hurley*, 426 F.3d 368, 385-86 (6th Cir. 2005)). Both Mr. Raider's Petition and his

Reply fail to address why trial counsel's decision not to object was not the product of any

22

objectively reasonable trial strategy. In contrast, the State notes that defense counsel may have made the tactical choice "to avoid bringing attention to the incident by objecting. The answer may be that prior firearm use and questions of marksmanship were not something the defense wanted to emphasize to the jury." (ECF #8 at PageID 81).

I agree with the State that not objecting to this brief exchange between the prosecutor and E.M. does not rise to the level of ineffective assistance of counsel. "[T]he decision whether to object in a particular instance is made in the strategic context of the entire trial, and any single failure to object does not constitute error unless the information introduced is so prejudicial to a client that failure to object essentially defaults the case to the state." *Bailey v. Woods*, No. 2:15-CV-77, 2016 WL 11263219, at *5 (W.D. Mich. July 25, 2016) (cleaned up), *report and recommendation adopted*, 2017 WL 191436 (W.D. Mich. Jan. 18, 2017). Indeed, "experienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment, which is why counsel often use objections in a strategic manner." *Id.* (cleaned up).

During E.M.'s testimony on direct examination, defense counsel for Mr. Raider objected on a number of occasions; each time, the objection was sustained. (*See, e.g.*, ECF #8-3 at PageID 787, 802, 806, and 807). Likewise, during E.M.'s redirect examination, defense counsel objected numerous times and many of those objections were sustained. (*See, e.g.*, ECF #8-4 at PageID 903, 913, 920-21, 927-28). From this, I can only conclude that defense counsel was not "asleep at the wheel" when E.M. recounted the incident when Mr. Raider shot her with his BB gun. Rather, it is far more likely that defense counsel was engaged in strategic decision making by not objecting, lest he call further attention to the incident. Finally, the admission of this testimony from E.M. did not "essentially default[] the case to the state."

23

For all of these reasons, I find that the third alleged error, standing alone, does not constitute ineffective assistance of counsel.

*Fourth Alleged Error – E.M.'s Testimony About Her Prior Conversation with Mr. Raider*

Finally, Mr. Raider complains that trial counsel did not object to testimony from E.M. that about a week before the shooting she had told Mr. Raider "she thought he was going to go crazy and kill someone in the future." (ECF #1-1 at PageID 34). He complains that this testimony was unduly prejudicial and defense counsel should have requested a curative instruction. (*Id.* at 35.) The State again responds that by objecting on the basis of undue prejudice, defense counsel would have conceded the relevance of the testimony. (ECF #8 at PageID 83).

In rejecting Mr. Raider's claim on this issue during his direct appeal, the Ninth Circuit reasoned as follows:

> With respect to Raider's claim that E.M.'s testimony that she told Raider that he thought he would go crazy and kill someone was inadmissible under Evid.R. 403, we cannot conclude that Raider met his burden to demonstrate ineffective assistance of counsel. The Supreme Court of Ohio has held that "the failure to make objections is not alone enough to sustain a claim of ineffective assistance of counsel." *State v. Conway*, 109 Ohio St.3d 412, 2006- Ohio-2815, 848 N.E.2d 810, ¶ 103; *see also State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 117. In light of Raider's blanket assertion that "[i]t is not within the professional norm to fail to object to such unfairly prejudicial testimony[,]" without a discussion of prejudice, we conclude he has not demonstrated ineffective assistance of trial counsel. *See Cepec* at ¶ 116–117.

*Raider*, 97 N.E.3d at 1201.

For the same reasons that I found the second and third alleged errors to be without merit, I cannot find the failure to object to this testimony, standing alone, rises to the level of ineffective assistance of counsel.

*Cumulative Effect*

Finally, Mr. Raider argues that even if trial court's individual acts or omissions did not constitute ineffective assistance of counsel, taken together they did. (ECF #1-1 at PageID 35; ECF #9 at PageID 1589). The State contends Mr. Raider has procedurally defaulted this argument "because he failed develop it in accordance with Ohio App. R. 16(A)(7)." (ECF #10 at PageID 1605).

The State is correct. According to the Ninth District:

{¶ 40} Finally, Raider argues that his trial counsel was ineffective in failing to request a curative instruction following the prosecutor's improper question (discussed below), and that trial counsel's cumulative failures deprived him of the effective assistance of counsel. Raider has failed to develop either of these claims. App.R. 16(A)(7). Raider has not explained how the failure to request a curative instruction fell below the standard required or how the alleged cumulative failures affected the outcome of the trial.

*Raider*, 97 N.E.3d at 1202. Therefore, Mr. Raider has procedurally defaulted this argument before this Court.

Even without procedural default, however, the cumulative error argument is unpersuasive. The Supreme Court has noted "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Harrington v. Richter*, 562 U.S. 86, 111 (2011).

The transcript shows engaged and vigorous advocacy by Mr. Raider's trial counsel throughout the entire trial. He delivered an opening statement (ECF #8-3 at PageID 589), and then cross-examined each of the State's eleven witnesses (*see* ECF #8-2 at PageID 379). Objections were lodged throughout the State's direct examination of its witnesses. (*See, e.g.*, ECF #8-3 at PageID 604, 619, 661 and 739; ECF #8-4 at PageID 940 and 1008). Following the State's

completion of its case in chief, defense counsel opposed the admission of certain State exhibits. (*See* ECF #8-5 at PageID 783-816). Then, defense counsel made an oral motion for judgment of acquittal under Rule 29 of the Ohio Rules of Criminal Procedure. (*Id.* at PageID 816-28). When that was denied, defense counsel presented the testimony of three witnesses as the defense's case in chief. (*See* ECF #8-5 at PageID 1214-1318; ECF #8-6 at PageID 1321-1395). As noted above, this included the testimony of two expert witnesses, a forensic pathologist (ECF #8-5 at PageID 1233-1318) and a certified firearms instructor who opined on matters relating to the model of weapon used in the shooting (ECF #8-6 at PageID 1321-95). Several exhibits were also proffered as part of Mr. Raider's case in chief, two of which were ultimately admitted. (ECF #8-6 at PageID 1396-1404). Defense counsel renewed the motion for judgment of acquittal after that. (*Id.* at PageID 1406-21). Finally, he delivered a closing argument. (*Id.* at PageID 1446-84). Ultimately, the jury acquitted Mr. Raider of the aggravated murder charge.

An independent review of the record leads me to conclude that Mr. Raider benefitted from active and capable advocacy by defense counsel continuously throughout the trial. For this reason, his cumulative error argument is unavailing. Mr. Raider did not receive ineffective assistance of counsel.

The First Ground for Relief does not warrant the issuance of habeas corpus relief.

**Second Ground for Relief**

In his Second Ground for Relief, Mr. Raider argues the prosecutor committed misconduct at trial. Specifically, Mr. Raider cites to a single question the prosecutor posed during his cross-examination of the defense expert witness Thomason regarding the propensity of the model of handgun in question to fire if dropped:

Q.     How about if I told you that before coming in here we dropped a Sig Sauer some 14 times –

      MR. HAFFEY:          Objection, Your Honor.

Q.     – some 14 times, and it didn't go off?

A.     I would still disagree.

      THE COURT:          . . . The basis for the objection?

      MR. HAFFEY:          The tests that the State made should be subject to cross-examination, and –

      THE COURT:          The objection is sustained.

      MR. HAFFEY:          ~ and the declaration –

      THE COURT:          The objection is sustained.

(ECF #8-6 at PageID 984-85; *see* ECF #1-1 at Page ID 37). According to Mr. Raider:

> It is improper for an attorney, under the pretext of putting a question to a witness, to put before a jury information that is not supported by the evidence. As noted above, the state did not later introduce a witness in rebuttal to back the prosecutor's claim. Therefore, there is no evidence in the record of that alleged testing.

(ECF #1-1 at PageID 37).

In declining to grant relief on this issue during Mr. Raider's direct appeal, the Ninth

District reasoned as follows:

> {¶ 42} Raider argues in his second assignment of error that he was deprived of a fair trial based upon the prosecutor's misconduct. Specifically, Raider argues that the prosecutor's question of defense firearms expert Thomason was improper and prejudicial, should have been stricken, and that a curative instruction was required. Under the circumstances of this case, and in light of the argument on appeal, we do not agree.
>
> {¶ 43} In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a court determines if the prosecutor's actions were improper, and, if so, whether the defendant's substantial rights were actually prejudiced. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "This Court has held that [a] judgment may only be reversed for prosecutorial misconduct when the improper conduct

27

deprives the defendant of a fair trial. The defendant must show that, but for the prosecutor's misconduct, the trier of fact would not have convicted him." (Internal quotations and citations omitted.) *State v. Brooks*, 9th Dist. Lorain No. 16CA010958, 2017-Ohio-5620, 2017 WL 2870215, ¶ 13. The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Miller*, 9th Dist. Summit No. 27048, 2015-Ohio-279, 2015 WL 340936, ¶ 22, quoting *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 140. (Internal quotations and citation omitted.). Thus, "[t]he prosecutor's conduct must be considered in the context of the entire trial." *State v. Pleban*, 9th Dist. Lorain No. 10CA009789, 2011-Ohio-3254, 2011 WL 2571628, ¶ 39.

{¶ 44} During the direct examination of Thomason, the State objected to a portion of his testimony, arguing that the testimony was information that was not contained in the expert report. At the end of the sidebar addressing the objection, the prosecutor withdrew the objection and then said, "but I don't want to hear he doesn't like all the materials that say you can drop this thing out of a plane, basically, and it won't fire." To which defense counsel responded, "Fine." On cross-examination, the prosecutor posed several troubling questions to Thomason, some of which were not objected to by Raider's counsel. For example, the State asked Thomason without objection whether he was aware that the State of California drops these types of guns out of planes without them discharging. Additionally, Thomason was asked about, and ultimately disagreed with, a statement from a website that indicated that the type of gun at issue "drop[s] safe from a reasonable distance," and that there would have to be "enough force to bend some serious metal before the gun could possibly go off." Raider has not challenged those questions on appeal. We note that part of the reason Raider may have decided not to challenge those questions on appeal is because of the discussion at sidebar mentioned above.

{¶ 45} Here, Raider only challenges one question posed by the prosecutor to Thomason. During cross-examination, the following exchange occurred:

[SAME AS QUOTED ABOVE]

{¶ 46} After considering this question in the context of the whole trial, we cannot say that Raider has demonstrated that, "but for the prosecutor's misconduct, the trier of fact would not have convicted him." *Miller* at ¶ 22. We have previously set forth the extensive trial testimony which included a substantial amount of evidence that would support Raider's guilt. In addition, any harmful effect of the particular question that Raider challenges on appeal was lessened by other related questions raised by the prosecution that were either not objected to or not challenged on appeal. Accordingly, in light of the foregoing, we cannot say that Raider has demonstrated that he was prejudiced by any improper conduct by the prosecution. *See Brooks*, 2017-Ohio-5620, 2017 WL 2870215, at ¶ 13. Considering the improper question in the context of the entire trial, including the other related questions which were

unchallenged, Raider has not demonstrated that, in the absence of that one question, he would not have been convicted.

*Raider*, 97 N.E.3d at 1202-03.

The Sixth Circuit follows a two-step approach to determining whether prosecutorial misconduct warrants a new trial. *See United States v. Carroll*, 26 F.3d 1380, 1385-87 (6th Cir. 1994). Under this approach, a court first considers whether the prosecutor's conduct and remarks were improper. *Id.* at 1387; *see also Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). If the remarks were improper, then the court considers and weighs four factors in determining whether the impropriety was flagrant and thus warrants reversal, as follows:

(1)     whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant;

(2)     whether the conduct or remarks were isolated or extensive;

(3)     whether the remarks were deliberately or accidentally made; and

(4)     whether the evidence against the defendant was strong.

*Carroll*, 26 F.3d at 1385; *see also Boyle*, 201 F.3d at 717. In reviewing a claim of prosecutorial misconduct, "the relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the conviction a denial of due process." *Lundgren v. Mitchell*, 440 F.3d 754, 778 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). In evaluating fairness, the trial must be "taken as a whole and within the context of the entire record." *Lundy v. Campbell*, 888 F.2d 467, 472–73 (6th Cir. 1989), *cert. denied*, 495 U.S. 950 (1990).

For the same reasons the Ninth District outlined, I conclude that the single question by the prosecutor does not constitute misconduct sufficient to warrant granting habeas corpus relief. The Ninth District's analysis of this issue sufficiently demonstrates why there is no constitutional

error sufficient to satisfy *Strickland*, especially under the habeas "doubly deferential" standard that applies in this context. Mr. Raider's second ground for relief lacks merit.

**Third Ground for Relief**

Mr. Raider's Third Ground for Relief is that the trial court should have granted defense counsel's request for "a more clear accident instruction." (ECF #1-1 at PageID 39). Specifically, Mr. Raider maintains that the trial court, in addition to the instruction it did give regarding the law of accident, should also have stated that Mr. Raider "had no obligation to prove anything regarding the issue of accident. It was the burden of the prosecutor to prove it was not an accident." (*Id.* at PageID 40).

On this issue, the Ninth District observed as follows:

{¶ 48} Raider argues in his third assignment of error that the trial court committed reversible error in failing to include Raider's requested instruction concerning accident. Specifically, he contends that the trial court should have included language that "the Defendant had no obligation to prove anything concerning accident[.]" The trial court declined to include the additional language and trial counsel objected. Because this Court concludes that the gist of the requested instruction was covered by the general charge, we cannot say that the trial court abused its discretion.

{¶ 49} "An appellate court reviews a trial court's refusal to give a requested jury instruction for abuse of discretion." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 240. "'[I]t is prejudicial error in a criminal case to refuse to administer a requested charge which is pertinent to the case, states the law correctly, and is not covered by the general charge.'" *State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, ¶ 134, quoting *State v. Scott*, 26 Ohio St.3d 92, 101, 497 N.E.2d 55 (1986). "'However, the trial court need not give the defendant's requested instructions verbatim but may use its own language to communicate the same legal principles to the jury.'" *Sowell* at ¶ 134, quoting *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 108.

{¶ 50} Near the beginning of the instructions, the trial court informed the jury that, "[t]he Defendant is presumed innocent unless his guilt is established beyond a reasonable doubt. The Defendant must be acquitted unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element

of every offense that was charged in indictment." Later in the instructions, in discussing the first count, the trial court provided the following definition of accident:

> The Defendant denies any purpose to cause the death of Brandon Smith. He denies that he committed an unlawful act and says that the result was accidental.

> An accidental result is one that occurs unintentionally and without any design or purpose to bring it about. An accident is a mere physical happening or event out of the usual order of things and not reasonably anticipated as a natural or probable result of a lawful act.

> If, after considering all of the evidence, including that on the subject of accident, you are not convinced beyond a reasonable doubt that the Defendant had a purpose to cause the death of another, you must return a verdict of not guilty.

{¶ 51} At the beginning of the instructions for each count, the trial court informed the jury that, before it could find Raider guilty of the count at issue, it had to find certain elements beyond a reasonable doubt. At the end of the instructions pertaining to each count, the trial court then instructed the jury that, if the jury found that the State had proven beyond a reasonable doubt all the essential elements of the charged offense, the verdict must be guilty. Whereas, if the jury found that the State failed to prove beyond a reasonable doubt any of the essential elements of the charged offense, the verdict must be not guilty.

{¶ 52} Given the foregoing instructions, we conclude that the trial court did inform the jury that it was the State's burden to prove the charged offenses and the idea that Raider did not have the burden of proof was covered by the general charge. *See Sowell,* 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, at ¶ 134–136. Raider has not pointed to any part of the jury instructions which places the burden of proof on him. Moreover, Raider has pointed to no authority that would suggest that an additional instruction was required in light of the other instructions provided. *See* App. R. 16(A)(7).

{¶ 53} Raider's third assignment of error is overruled.

*Raider,* 97 N.E.3d at 1203-05.

In his Traverse, Mr. Raider indicates he is withdrawing this argument as a basis for habeas relief: "Raider concedes that there is no firmly established Supreme Court of the United States precedent controlling the issue raised in the Ohio courts. He cannot establish a violation of §2254(d)(1)." (ECF #9 at PageID 1602). Based on this concession, I decline to give further consideration to the merits of Mr. Raider's Third Ground for Relief.

CONCLUSION AND RECOMMENDATION

Following review, and for the reasons stated above, I recommend the Petition be **DISMISSED**. I further recommend that Mr. Raider not be granted a certificate of appealability.

Dated: <u>January 6, 2022</u>

_____

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

**Objections, Review, and Appeal**

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl,* **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object."** *Howard v. Sec'y of Health and Hum. Servs.,* **932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific**

objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).